[No. 1871.]

ROBERT SMITH *v.* THE STATE.

PRACTICE — POSTPONEMENT — NEW TRIAL. — See the opinion *in extenso* for a showing of diligence in an application for a postponement of the trial to a future day of the term, *held* sufficient, and the statement of the case for evidence set out in the application for a postponement, which, in view of the ruling of the trial court, and the evidence adduced, entitled the defendant to a new trial.

APPEAL from the District Court of Fayette. Tried below before the Hon. H. Teichmueller.

The conviction in this case was for the theft of a horse, the property of James Reynolds, in Fayette county, Texas, on the 29th day of October, 1884. A term of six years in the penitentiary was the penalty awarded.

James Reynolds was the first witness for the State. He testified that he lived near the town of Schulenburg, in Fayette county, Texas. Witness went to the town of Schulenburg on the evening

of Wednesday, October 29, 1884, riding the horse described in the indictment.    That animal was a paint pony, his brand being an in-: describable Mexican device.    About sundown on that evening the witness hitched that horse to a public rack, and left him.    He returned about 8 o'clock on that night, and found that his horse had been taken away by some one.    When taken the horse had on a small "applehorn" saddle, from the horn of which a quirt was suspended, and in the rear of which a small "slicker" which belonged to the witness's brother was secured.    On the Sunday following, the witness heard of his horse in the town of Ledbetter, through an advertisement in the Galveston *News*, which described the horse, and his then whereabouts.    Witness went to Ledbetter on the following Monday, and at the livery-stable of J. F. McGuire found his horse, saddle, rope, quirt and slicker.    The horse belonged to witness and was taken from his possession without his consent.

Little Stansel, the next witness for the State, testified that he lived on the public road between Schulenburg and La Grange, a short distance from the former town.    Witness knew the prosecuting witness Reynolds, and also knew his paint horse, the animal mentioned in the indictment.    Witness saw Reynolds riding that horse towards Schulenburg late in the evening of Wednesday, October 29, 1884.    Late on the same night, a negro rode that horse up to the witness's house, stopped, and asked the witness if he was on the right road to La Grange.    The witness could recognize the horse in the dark, but not the man, and could not say that the defendant on trial was the man he saw that night on Reynolds's paint horse.    The man described had on a pair of new boots when he stopped at witness's house on Reynolds's horse.

G. Bohms testified, for the State, that he resided in the town of Schulenburg, Fayette county, Texas, in October, 1884, and was then engaged in merchandising.    He knew the defendant well, and remembered that he was in the witness's store about 11 o'clock on the morning of October 29, 1884, and purchased, among other things, a pair of boots and a hat.

It was admitted that the defendant, in the town of Schulenburg, about 11 o'clock on the morning of Wednesday, October 29, 1884, sold a grey horse to Louis Barca, and executed his bill of sale, which bill of sale had been lost.

J. F. McGuire was the next witness for the State.    He testified that he lived in Ledbetter, Fayette county, Texas.    While the witness was sitting in front of the hotel in Ledbetter, shortly after noon, on or about the last day of October, 1884, one Robinson, who was a hostler at the witness's livery-stable, came to witness and told

him of a negro who had a horse he was offering to sell. The witness first examined the horse, and then looked well at the negro, and remarked that the horse might have been stolen from some one. The negro replied that the title was perfectly good, and that he would take $50 for the animal. The witness offered him $20 for the animal, which after some hesitation and talk he agreed to take. Witness then directed him to take the horse to the stable, and followed. After an employee of the witness had taken the horse into the stable, witness walked up to the negro, pulled up his hat and looked at him well. At the same time he told his employee, Robinson, to look at the man well, so that he could identify him in the future, if necessary. Witness remarked in the same connection that he believed the horse was stolen property. Defendant then wanted to take the horse out of the stable. Witness declined to deliver the horse, saying that he had purchased him, and would go to a certain store, that of McClellan, and write a bill of sale, and directed the man to go to that store, sign the bill of sale, and get his money. Witness went to McClellan's store to write the bill of sale. He was soon joined by his employee, Robinson, who said something about the man sending him for the money. Witness told Robinson to go back and tell the man that he, witness, was telegraphing to different points to find out from whom the horse had been stolen. Robinson left and soon returned and told witness that the man who sold him the horse had left without horse or money. Witness then telegraphed the Galveston *News*, describing the horse, and notifying the owner to call for him. The horse was kept at the witness's stable several days. Witness was away and did not know what day the owner appeared and claimed him. The owner got the horse from W. B. McClellan, whom the witness left in charge of his business. The animal described was a paint pony in an indescribable Mexican brand. He was brought to the witness's stable, and his sale to witness was there negotiated, by the defendant. There was no question or doubt in the mind of the witness as to the identity of the defendant. The witness conducted a wood-yard in connection with his livery business, and employed constantly from forty to fifty negroes. He always closely observed negroes,— a habit incident to his employment of negroes, and as a means of identifying them, and he knew that, having once particularly observed a negro, he would know him afterwards. La Grange is situated nearly midway, and on the route from Schulenburg to Ledbetter, about seventeen miles from the former, and about nineteen miles from the latter place.

Jake Robinson, testifying for the State, corroborated McGuire as

to the description of the horse, and added that he first saw the defendant shortly before dinner on the day of the transaction described by McGuire. Defendant came to the stable and asked witness what it would cost him to have his horse fed. Witness told him and he left, saying that he would bring his horse presently to be fed. On his way to dinner, the witness saw the defendant in the street and asked him about bringing his horse to the stable to be fed. Defendant brought the horse to the stable shortly after the witness got back from dinner. Witness asked him why he did not bring his horse up the front public street. He replied that he did. Witness told him that he was telling an untruth; that he, witness, saw him bring the horse up the back way. Defendant then said that he wanted to sell the horse. Witness replied that he would buy no horse unless he knew that the title to the same was good, but that perhaps McGuire would purchase. Witness then took the defendant to McGuire, who was then at the hotel, and told him that the defendant wanted to sell a horse. McGuire looked at defendant, and remarked that possibly the horse he offered for sale was a stolen horse. Defendant denied that such was the fact, and after some talk McGuire agreed to buy the horse for $20, and told witness and defendant to take the horse to the stable while he went to McClellan's store to write a bill of sale. Arrived at the stable the defendant complained that he was sick, and declined to go to McClellan's store to sign the bill of sale, and get his money, and asked witness to go for him. Witness went, and McGuire told him to go back and tell defendant to come to the store. Witness complied and returned with defendant, but defendant would not enter the store, but only looked in at a window. When witness went back to the stable, the defendant was gone, and witness saw no more of him until after his arrest. When witness and defendant went to McClellan's store, McGuire told witness to take a good look at defendant. McGuire did not go with witness and defendant from the hotel to the stable; he did not, at the stable, take defendant's hat off and tell witness to observe him closely in order to know him in the future; he did not direct witness to go from McClellan's store and tell defendant that he was telegraphing to find out the owner of the horse. Defendant on trial was unquestionably the man who sold the paint horse to McGuire. The State closed.

Sam Grant was the first witness for the defense. He testified that he saw the defendant in the town of Schulenburg on the 29th day of October, 1884, and about 3 o'clock on that evening saw him buy a ticket to Luling and board the train going west towards Luling, and knew that he left Schulenburg on that train.

C. McDaniel testified, for the defense, that the defendant came to his house in Luling, Texas, some little time after the west-bound train arrived on Wednesday evening, October 29, 1884. Defendant ate supper at witness's house on that night, and then went to the house of Frances Harrell, the witness's mother. The said Frances testified that the defendant spent that night at her house.

Lou Williams testified, for the defense, that she boarded the east-bound train at Schulenburg, on Thursday, October 30, 1884, and found the defendant in one of the cars. Defendant said that he had come from Luling on that train. The two went together to Eagle Lake, and picked cotton for the next two or three weeks.

Weller, Coleman and Brown testified for the defense that, during the several years they had known the defendant, he had sustained a good reputation for honesty.

According to the application for postponement, the defendant expected to prove by the absent witness Tevis, that he, Tevis, was at the railroad depot in the town of Flatonia, Texas, when the west-bound passenger train passed on the evening of October 29, 1884; that he saw defendant on that train, and that defendant told him that he was *en route* to Luling.

The motion for new trial raised the questions discussed in the opinion.

*Phelps & Lane*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. In this case the indictment was presented and filed on the 20th of November. On the 21st defendant procured the issuance of process for his witnesses, and amongst them an attachment for the witness Tevis, which was returned not executed, on the 28th, the day on which the case was called for trial. When the case was called defendant applied for a postponement to a future day of the term, in order that he might secure the attendance of his absent witness, Tevis, who, it was alleged, was on that day at Columbus, sick and unable to attend; and a telegram from said witness was made an exhibit to the motion showing that he was sick at Columbus, which is in the adjoining county to Fayette. It was nearly a month after this application for a postponement was made and overruled by the court, before the court was adjourned for the term, on, to wit, the 26th day of December, 1885.

We are of opinion defendant was entitled to the postponement when the evidence sought from the absent witness is considered with

the evidence adduced at the trial. Due diligence to get the witness was shown; the testimony was material, and it is not lacking in probability as to truth when taken in connection with other evidence in the case. (*Miles* v. *The State*, 14 Texas Ct. App., 436; *McDow* v. *The State*, 10 Texas Ct. App., 98; *Ninnon* v. *The State*, 17 Texas Ct. App., 650.) Having refused the application in the first instance erroneously, it was additional error to overrule the motion for a new trial based upon this ground.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*